Before we begin our proceedings today, I'd just like to say on behalf of Judge Taranto, myself, and indeed the entire court, we'd like to welcome Judge Kovner from ED New York, who's here helping us this week, and we're delighted to have her. Thank you. First case for argument this morning is 24-1102, TrackTime v. Amazon. Mr. Greenspoon. Thank you, Your Honor. Good morning, Your Honors, and may it please the court. I'll start with the 978 patent and then move on to the 638 patent. The district court invalidated the 978 patent prior to and without the benefit of this court's DIFAN and WSOU decisions. Those decisions hold that claim limitations written as executable code for performing a function where the function is known in the art will not trigger means treatment. They are not nonce words. Isn't it more limited than that in the sense that, and I would be the first to, I think it's a little hard to interpret the collection of five or six cases we have in the area, but the ones that are most helpful to you, DIFAN, maybe zero-click, the non-PREC WSOU, is that what it's called? Yes, Judge. Which is sort of half helpful to you and half not, right? There's a piece that was, in which 112-6 was rejected, right? I don't recall that, Your Honor. Two different patterns, I think. But I thought that the DIFAN in particular, to focus on that, but zero-click as well, involved and kind of rely on the fact that they involved two kinds of things. One, a function at some level that feels like a software step and not just a user-end result. And second, the intrinsic and extrinsic evidence that skilled artisans would recognize off-the-shelf software as being available to perform those. And I'm not sure you have either of those two things here. That's kind of at least where my focus is. Well, Judge, I don't think the case is turned on the point that Your Honor just mentioned. I think the case is turned on the analysis of whether the executable code limitation as written in those patents would be deemed a nonce word or not. And in all the cases, the thread running through all of them, it's the burden of the challenger to demonstrate that these are nonce words triggering means-plus-function treatment. By clear and convincing evidence, I believe. In this case, in DIFAN, for example, the case turned on the fact that it was unrebutted testimony in the record, unrebutted evidence that this was a limitation directed to a class of structures and therefore known in the art as something of its own, not just a nonce word. So on that level, we run on four legs with DIFAN. We have unrebutted testimony in the record. We have just a variety in the declaration of our expert, a variety of off-the-shelf software items that have the facilitating annotation class of structures and the synchronously playing multimedia class of structures. When you say you have it, this is how I'm remembering things and you can correct me. I thought you pointed as to both of the limitations that issue to just one, which is live note in the spec, and then you say, look at the other side's validity challenges and they rely on all sorts of prior art that shows this, so it must be kind of conventional. Our presentation actually was much more comprehensive than that. Our expert named something like six or seven. So there's anything else besides live note in the spec? In the spec, I don't recall anything besides live note. But what's intriguing is that we have in the record at 1680 and 1691, Amazon's own claim chart mapping live note onto this limitation. So I don't think there was ever any dispute that the facilitating annotation and synchronously playing multimedia features as software features were a class of structure known in the art. Thus, when the executable code language appears in the claims, that is going to be immediately perceived by a person of skill in the art as structural. So I think your adversary says the expert's explanation is too conclusory, and I wonder if you could respond to that. That confused me when I read that, because the expert goes through point by point all sorts of different existing off-the-shelf programs. I don't have recollection of all of them, but there are six or seven of them. That's a declaration at 1634 to 1645. So I don't understand how we can call that conclusory when that reaches precisely the question under the legal standard whether this is a class of structures understood by persons of skill in the art. So moving on to the 638 patent, I'll just double-check something. Assuming that all of that is true about the prior art, you still think you can escape prior art invalidity defense? Yes, yes, we're confident. Of course, that's not before this court in this appeal, but we're confident that on remand there's still very much of a case to be What I read in the district court decision is that there's no engagement with the expert evidence whatsoever. There is a, you know, some kind of analysis and a conclusion of indefiniteness, but there's no citation or discussion of our expert evidence on this point in that section of the district court's opinion. Well, so let's assume that the district court did consider the expert and just found that you hadn't met your, you hadn't actually presented persuasive evidence that a person of ordinary skill in the art would have understood it as your expert said. What then? Is that, how do we review that? If that's what the district court did, and actually it did not, it did not engage the expert, but had it engaged the expert and come up with some verbiage of that nature, it still wouldn't be enough to invalidate or render indefinite these claims. Because recall, it's Amazon's burden by clear and convincing evidence to show that the executable code limitation is not a nonce term. So whatever our experts said or didn't say, you know, in a very real sense shouldn't have mattered anyway, because it's really the absence of evidence from Amazon's side that controls the question. But at least just on the terms of the standard of review, your view is that the evaluation of expert evidence about skilled artisans' understanding is a factual matter, but it's one on which they have a burden and elevate it because it's an invalidated charge. Exactly, and I believe that's explicitly stated in basically those terms in zero-click and the WSOU and DIFAN probably in less detail. So on the 638 patent, I'll address the new trial ruling and Alice step one, if I can have time for that. Most remarkable here on the new trial is that Amazon responded to the clear weight. This is the one where there are so many grounds that the jury rejected it on, it's a little hard to count. I agree. If you would address the anticipation by live note. Yes, and so I agree there's quantity but not quality in the district court's ruling. So anticipation by live note, that's that you could you could say there's a verb I learned preparing for oral argument today, mosaicking. Mosaicking will not end up with a proper anticipation finding. So on live note, we demonstrated that there was no legally sufficient evidence on which the jury could find anticipation. The reason was the live note prior art presentation by Amazon was of a whole system. It was a commercial product system and they produced a variety of manuals, some manuals over here, some manuals over there, and what they stitched together was that in one very, very narrow aspect there's a tablet PC on which you can use a pen stylus to write handwritten annotations. Fine, as far as that goes. That tablet PC was never involved in any kind of media navigation. On the other hand, they did present some documentation of a big, you know, desktop computer operating with a mouse and as we show in the briefing, that's not a mobile device, that's not human touch gestures used to navigate the multimedia. So there is no under the net money in line of cases for there to be anticipation you have to have. I mean in the piece of prior art you have to connect into something like a single embodiment of different pieces for the claim. Why wasn't that a factual, which would generally be a factual question because it's about reading the prior art, why wasn't it a triable factual question and therefore the jury's verdict has to stand? Well it was triable, but of course under the net money in standard, the legally sufficient evidence had to be that which showed the claim as arranged in the claim. So all the elements as arranged in the claim. When you have disembodied mosaic items that never really interoperated for purposes of what the claim was doing, there's no anticipation. So it's a, it's an absolutely rock-solid, j-mal, no substantial evidence issue. Am I remembering right that the live, your new trial grounds affect a number of the prior art in validity, but not the live note anticipation? That is not correct, your honor. If you read the clear weight argument in our new trial section of our brief. Clear weight, but other new trial, do you have other new trial arguments? We do, but they sort of stand independently of the clear weight issue. So the inconsistency in the verdict issue didn't directly reach the live note issue. I think that may be what your honor is thinking. But again, all these new trial grounds, they're all interwoven together. And so if we show jury confusion and manifest injustice, for example, with the inconsistency between the Talb anticipation and Amazon music infringement, that confusion was woven into every single issue. Likewise, with the improper exclusion of the draft patent application, the improper exclusion of the patenting statements by Amazon on unconventionality. I see I'm well into my rebuttal. Let's hear from the other side. Thank you. Good morning. May it please the court. Dave Hadden for Amazon and Audible. Let me start with the 978 patent, as counsel did. Tracton's reliance on zero-click and die fan is incorrect. The patent itself explains that the computer executable program code. First, the claim requires that it has to be in mobile computing device software. And the whole premise of this patent is that that mobile computing device software did not exist. And so if we look even at the first column of the patent, it explains the problem. And it says that, and this is around column one, line 52, existing software, and it's talking about this transcript management software, like LiveNote and Sanction and they're discussing the patent. It says that that software requires a full version of Microsoft's Windows operating system. And it goes on and says, as a result, the full Microsoft Windows operating system is unsuitable for mobile computing devices, and they cannot run transcript management utilities. So the saying, the problem we have is that there is no software for managing these transcripts and doing this synchronization that can run on a mobile computing device. And it goes on, that same part of the column one says, the result is that there has been no transcript management utility for display of smoothly scrolling synchronized text and multimedia for use on a mobile computing device. So in ZeroClick and DiFAN, the patent in ZeroClick, the claim itself referred to existing programs. It's talking about existing user interface programs. And in DiFAN, same issue, the undisputed testimony was that these programs were existing, you could take one off the shelf, and a skill would understand that the executable program or the program code elements were referring to those off-the-shelf programs. Here we have completely the opposite. Patent says, there is no off-the-shelf mobile computing device software that will do this. That's my invention. And the applicant told the patent office the same thing during the prosecution. This is at Appendix 1599. This is a quote, applicant's solution required extensive effort, time, and money to complete. In fact, in developing software that would function on a mobile computing device because a mobile web browser would not so function, applicants spent approximately $150,000 and approximately 18 months with professional software developers. I think the statements you're alluding to are saying, are disclaiming the idea that there are off-the-shelf programs that can do these specific pieces. Because I take it they're saying, yeah, our software, the thing that we're trying to patent is innovative. And there's not a program that does this whole thing right now. But I guess for this to be, there are very specific tasks that they're describing being performed by some means or some executable software code. You think the language that you just read indicates that those very specific tasks can't be performed by off-the-shelf software? Well, I think the problem is the whole claim is for this mobile computing device software. And the whole premise of the patent is that that didn't exist. It didn't exist to perform any of the functions that are described in the patent and claimed. Whether it's annotating, whether it's tapping and clicking, like in the 638 patent, the whole premise is that didn't exist. It could only run it on a desktop. I think this is the question that Judge Kofner was asking. The passages that you read from the bottom of column one say, maybe. We don't have a package that does everything necessary to do this on a mobile device. Doesn't quite say there's nothing off-the-shelf for individual components like the annotating part, as opposed to annotating and then getting the switch made over to the video and all of that. And the two claim elements in the two that are at issue here, one of them is about the annotating and the other about synchronously playing, I think, the two pieces. Why is there not a gap there? I don't think there's a gap, because the question is, if you read the claim and those executable program code elements, whether it's for facilitating annotation or synchronizing, in the zero-click, die-fan land, undisputed evidence, the person of skill would read that and say, oh yeah, that's this off-the-shelf package I can grab over here and it will run. There's nothing like that here. The patent says there's no mobile device software that will do this transcript management stuff. There's no suggestion that a piece of LiveNote or something else could have been separately run on a mobile computing device. There's nothing like that. So what do you make of the expert testimony that a person skilled in the art would have understood, hey, these are things, there's a lot of software out there. Well, if he's saying that LiveNote and all these things existed and could be run on a mobile computing device, then he's just contradicting the patent. He didn't say that, he just lists what is listed in the invalidity contentions and in the spec, but there's no analysis that says this particular feature or functionality of LiveNote could have been run on a mobile device. There's nothing like that. So it's not detailed enough? No, he doesn't say it at all. There's no testimony from a person of skill in the art that says, I recognize this as an existing software package that can run on a mobile computing device. There's nothing like that. So that is the key difference, and if you think about it, right? So I'm looking at the summary of his testimony rather than his, so maybe it's just factual dispute about what he said, because your adversary says, Dr. Agrawala testified that skilled artisans would have understood the claim implications to refer to well-understood code. Is that not what he said, or do you think it's too conclusory? Well, he pointed to the LiveNote, and he said that in a conclusory way. He didn't say that there's something in LiveNote that could have run on a mobile computing device that someone would have taken off the shelf and used in this way. He just ignored this requirement that it has to be for this mobile computing device software, which is the whole purported invention. These claim elements, right, they have mobile computing device in them, mobile computing device, but at least that the way, I don't remember, what follows it is the executable program code configured to do these different things, either the annotation or the synchronization. Was the analysis by the district court one that said the function was this function on a mobile device or just this function of annotating? I don't think that, I think the district court just followed the claim language. The claim language says, wherein said mobile computing device software comprises executable program code configured to facilitate annotation. So the court, maybe I'm not following you. Right, so, okay, let's just look at that one. So the where in the mobile device comprises something. I guess I have been remembering that the parties were discussing and the district court was discussing. Putting that aside, we're now into an expression, executable program code configured to. That's got to be the thing that either has structure or doesn't have structure. And if it doesn't have structure, then you look at the function and we're into 112.6. Without regard for this phrase mobile device. And you want to build in the need to be able to be run on a mobile device into the analysis of the nonce or not nonce word for these functions. I'm not trying to build it in. My point is that because it says that it's mobile computing device software that comprises this stuff, that is inconsistent with the argument that we are like zero click and diving. Because there is, as I've gone through the spec, the patent says there is no existing mobile computing device software that does this stuff. So one of skill cannot read this and the intrinsic record and say oh yeah, that's referring to a known off the shelf package that I can take and use on a mobile computing device to achieve this functionality. And I guess on that particular one, the element in claim one, the mobile device is actually in the back half of it also. That is in the functional description. Yeah. Okay. But that's not quite true of the claim two one, right? I'm sorry, Your Honor. That's not equally true of the claim two element. Yeah, I know it is. Mobile computing device software comprises executable program code configured to synchronize. It's exactly the same in both. So the point is, I mean stepping back, the whole premise of this patent is we invented some new mobile computing device software that did this stuff that before you needed a desktop computer to do, like with Latina. That's the whole thing. And when we get to the point of novelty, which is doing this on a mobile computing device, there's no there there. There's nothing in the patent that says how to do it on a mobile computing device, which is why Judge Narutka found this ineligible under 101. There's no solution. But there is also nothing to establish what this structure is because they say it doesn't exist, right? We're going to develop it. And they told the patent office we spent $150,000 to develop it. But that means the whole software, right? No, not this. It's not that every... I understood, Your Honor, but that piece of the prosecution history I was reading from was in response to an office action related to this Claim 2. So it was directly addressing this limitation. But the other point is, right, so we get to kind of the point of novelty here, mobile computing device, and it's only described in the vaguest functional way, right, to facilitate annotation. Like, what does that mean? And what structure would be known to a person with skill in the art that could facilitate annotation? Did you have your own expert or it's their expert and then kind of the construction of the language of the claim? No, we had our own expert, and Judge Narutka credited him and relied on him. So do you think this, because I guess part of what I'm trying to understand is what the district court made of that, because it doesn't seem like the district court said, hey, you know, said exactly what you were saying about their expert or said, hey, we credit your expert. How is that all reflected in this? So I think what Judge Narutka did is she credited our expert, Dr. Schoenfeld, and said to a person with skill in the art, just saying executable program code is not sufficient structure to perform this function. And she looked at the intrinsic evidence and saw that contrary to the argument that we're hearing today, there's nothing in the intrinsic evidence that identifies some existing off-the-shelf program that would perform this function. So you think it's kind of implicit in the analysis is comparing of the experts, and how is that reviewed now? Is that reviewed de novo? I would think it's reviewed for abuse of discretion. Because it's a factual issue? It's an underlying factual issue. Abuse of discretion? Clear error? Clear error, yeah. Sorry, Your Honor. Have I answered your question on 9-7-9? I guess we have another patent to talk about. Yeah, we have another patent to talk about. So as Your Honor noted— What about mosaicing? Excuse me? What about mosaicing, if that was the right expression? Mosaicing? I've never heard the word either used that way, but that was like the centerpiece of this point. So we're talking about LiveNote. Yeah, so LiveNote was a product, and the documentation for it that Dr. Schoenfeld went through and explained to the jury explained that it could run both on a desktop computer and on a tablet PC. So it wasn't this notion that there's some limited functionality over here that you could do on a tablet PC. No, the software ran on a tablet PC. And so it called out saying, because it now runs on a tablet PC, you have this additional ability to annotate with the stylus on the screen, which they point to, but it does everything else on the tablet PC, too, including being able to jump to a place in the video when you select a word. You can now select a word not with the mouse, but with the stylus or your finger on the touchscreen. So there's one product. It ran on this mobile device, as Dr. Schoenfeld explained. And just to be clear, this was a product anticipation, not a single publication anticipation? Yes, Your Honor. Okay. It was a product, and there was user documentation that was relied on. I see I'm out of time. I can stop here. Other than that, there are six grounds that have plenty of evidence. Thank you. I'll very quickly address LiveNote. There was no documentation and no testimony that the fully functional LiveNote worked on a tablet PC. Instead, as you see on page 8906 in the record, there was a tablet PC which had only one function, which was to allow these annotations. It was a very thin feature set in the tablet PC itself. So that's why the mosaicing problem, really more precisely the net money in problem of no evidence of the elements of the claim arranged as in the claim was a very real problem and meant that there was legally insufficient evidence for anticipation. On all of my friend's argument on the 978 patent was waived. There was no indication in the red brief that he was going to come here and explain to Your Honors that the mobility or the mobile computing device aspect kind of bled into the full flesh of the executable code claim element. And just reading the executable code claim element, I think, Judge Kovner, I think you hit it, which is it comes after the recitation of the mobile computing device. The facilitating annotation is just the executable code is configured to facilitate annotation. Finish that phrase. Of course. Of a portion of said synchronization index responsive to user input received by the mobile computing device. By the mobile device. Well, that's just a receipt. That's a trivial data exchange that we're talking about. So there is going to be data exchange for receipt in the commercial products. You don't think that that almost necessarily implies that this annotation function has to be doable on the mobile device. Not so that the question is this off the shelf is a question about whether a mobile version of it is off the shelf. To answer that question, I think we have to pan out. The question we're getting very deep in the weeds. The question is really did they provide evidence, support their burden of proof to show that this was a nonce word. We have case law saying that if the executable program code reflects a class of structures known in the art, then when that evidence is undisputed, then there's no indefinite in this issue here. We don't trigger means treatment. When you say this is undisputed, your adversary got it and said they had an expert. Right. And to that point, there's another inaccuracy I have to report to the court, which is Dr. Schoenfeld, their expert, did not provide any opinions on this question of nonce status for the executable code claim element. He went straight. He did present a declaration. He went straight to the is there an algorithm in the specification or not question. But he did not present any testimony at all whatsoever on this point. And nor did nor did the district court credit Dr. Schoenfeld on this point because he had no evidence on this point. So I would like to just conclude, if I may, with 10 seconds on Alice step one. I know I didn't we didn't have an exchange in pure rebuttal format, but I would just like to say the framework. I would ask your honors to look at this patent. The 638 patent is the framework of a not a user interface as such, but instead a computer navigation interface. That brings us squarely within the ambit of core wireless and data engine. And unless there are further questions. Thank you for both sides. Thank you very much.